IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 1, 2022

**STATE OF TENNESSEE v. DARIUS MACK**

**Appeal from the Criminal Court for Shelby County**
**No. 18-03765          John W. Campbell, Sr., Judge**
_____

**No. W2022-00224-CCA-R3-CD**
_____

A Shelby County jury convicted the defendant, Darius Mack, of first-degree premeditated murder and tampering with evidence for which he received an effective sentence of life plus three years in prison. On appeal, the defendant argues the trial court erred in denying his motion to suppress. He also contends the evidence presented at trial was insufficient to support his convictions. After reviewing the record and considering the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and KYLE A. HIXSON, JJ., joined.

Phyllis Aluko, Shelby County Public Defender; Barry W. Kuhn (on appeal) and Robert Gowen and Kaitlin Beck (at trial), Assistant Public Defenders, for the appellant, Darius Mack.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Joey Griffith and Katie Farley, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

***Facts and Procedural History***

This case arises from the murder of Tryeece Fossett, the victim, on October 4, 2017. As a result, the defendant was indicted for first-degree premeditated murder and tampering with evidence. Prior to his arrest, the defendant spoke with Sergeant Michael Coburn with

the Memphis Police Department ("MPD") concerning his possible involvement in the crimes. The defendant subsequently filed a motion to suppress his statement, and the trial court conducted a pretrial hearing on August 14, 2020.

I.      Motion to Suppress Hearing

MPD Sergeant Michael Coburn testified that on October 4, 2017, he was called to a homicide scene outside a boarding house on Keystone Avenue. While on the scene, Sergeant Coburn spoke with two witnesses who informed him that the defendant lived in a room at the boarding house with his girlfriend, Ashley Brown, that the defendant was on the scene of the homicide, and that the defendant left the scene when he was told the police had been called. In addition to speaking with the witnesses, Sergeant Coburn also recovered surveillance video from the security system of a residence across the street. The video showed a red Nissan Versa hatchback driving back and forth in front of the boarding house, a person shooting into a car parked at the end of the driveway of the boarding house, and the same person returning to the scene and picking up shell casings from the street. Upon further investigation, Sergeant Coburn discovered that the red Nissan Versa hatchback from the video was registered to Ms. Brown. After a fifteen-day search, Sergeant Coburn found the defendant and Ms. Brown living in the red Nissan Versa at the defendant's grandfather's house.

After locating the defendant and Ms. Brown, Sergeant Coburn had them transported to the police station for questioning. According to Sergeant Coburn, they arrived at the station around 11:30 a.m. and were placed in separate interview rooms. The defendant was restrained to a table in his interview room. During this time, officers gave the defendant pizza and water and allowed him bathroom and smoke breaks.

At 4:40 p.m., Sergeant Coburn advised the defendant of his rights. Sergeant Coburn had the defendant read aloud the advice of rights form, which included his *Miranda*[1] rights, initialing by each of his rights, indicating that he understood them. The defendant then signed the "waiver of rights" section of the form, expressly waiving his *Miranda* rights. According to Sergeant Coburn, the defendant was calm, unintoxicated, and not overly emotional.

At the outset of their conversation, the defendant relayed his biographical information to Sergeant Coburn, including his date of birth, social security number, and phone number. The defendant stated he could read and write without glasses, was not under the influence of any drugs or intoxicants, was not suffering from any mental disorders, and was not under any physical discomfort that would keep him from

---

[1] *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

participating in an interview. The defendant noted that he completed twelfth grade, that he understood he was speaking to law enforcement personnel, and that he had previously been arrested for domestic violence and for a driver's license issue. Initially, the defendant denied shooting the victim but admitted to being at the boarding house and knowing the victim. However, after being confronted with information to the contrary, the defendant changed his story and admitted to shooting the victim; yet, the defendant claimed he did so because the victim first pulled a gun on him. Despite Sergeant Coburn informing the defendant that they did not find a gun on the victim or in the victim's car, the defendant maintained his claim that the victim pulled a gun on him.

At that point, the defendant's statement was reduced to writing. The defendant was again advised of his rights and initialed another form acknowledging the same. The defendant again stated that he did not want a lawyer and that he would continue answering questions. The defendant then narrated a statement while a third party typed it out. Upon completing and reviewing his written statement, the defendant initialed each page and signed and dated the last.

In addition to the testimony of Sergeant Coburn, the defendant and his grandfather, Clayburn Anderson, also testified at the suppression hearing. Mr. Anderson testified that he raised the defendant. According to Mr. Anderson, the defendant was "kind of slow" and was enrolled in resource classes in high school. The defendant did, however, graduate high school. Mr. Anderson confirmed the defendant had a job, a girlfriend, and a car; however, he testified that the defendant "d[oes not] understand what people [are] talking about a lot of time." According to Mr. Anderson, if the defendant does not understand what people are saying, he just agrees with them.

The defendant testified that on October 19, 2017, he was taken to the police station and questioned about his involvement in the death of the victim. The defendant claimed that the interrogation process left him tired and frustrated and that several officers came in and out of the room, banging on the table and threatening to "lock up" Ms. Brown if the defendant did not confess. The defendant also claimed that one officer opened the door to the defendant's interview room so the defendant could hear Ms. Brown crying in her interview room. Though the defendant admitted he was never physically threatened by the officers, he claimed he told law enforcement what they wanted to hear in order to end the questioning. The defendant also claimed he did not ask for an attorney because he did not know he had a right to have one present.

On cross-examination, the defendant was asked about a previous occasion when he was questioned by law enforcement concerning his involvement in the rape of a twelve-year-old girl. Specifically, the defendant was asked if he had been given an advice of rights form, if he waived his rights, and if he gave a written statement during that interrogation.

While the defendant remembered officers asking him questions, he denied signing an advice of rights form, waiving his rights, and making a written statement.

At the conclusion of the hearing, the trial court entered a written order denying the defendant's motion to suppress, making the following finding:

From the proof, the [c]ourt finds that the defendant was unequivocal about waiving his rights and giving a statement to police. A review of the proof adduced at the hearing indicates that the defendant understood his rights and was not coerced in any way to waive his *Miranda* rights. The [c]ourt finds the admonitions contained in the waiver were adequate under *Miranda v. Arizona*, 383 U.S. 4365, 86 U.S. S.Ct. 1602, 16 L.Ed.2d 694 (1966). The [c]ourt finds that at no time during the questioning of the defendant did the defendant ask for an attorney or refuse to answer questions.

The [c]ourt further finds from the proof that [Sergeant] Coburn neither coerced, threatened, or in any way forced the defendant to give a statement. The [c]ourt finds that the defendant was cooperative but evasive in his answers to police and ultimately gave a statement [that] was extremely self[-]serving. The State has the burden of proving that the defendant had waived his *Miranda* rights by a preponderance of the evidence and the [c]ourt finds that it has done so.

As to the allegations that law enforcement threatened to lock up the defendant's girlfriend as a means of overcoming the defendant[']s will, the [c]ourt finds no evidence adduced that supports this claim. As to the allegation that the defendant had intellectual difficulties that prevented him from understanding what was going on or made hi[m] susceptible to pressure is also not supported by the proof. The fact that [the] defendant was in resource classes while in school does not, in and of itself, prove the defendant could not make a valid decision about giving a statement to law enforcement. The proof as a whole that was adduced at the hearing shows that the defendant understood what was going on and was not compromised by any mental issues.

II.     Trial

In October 2017, the victim, the defendant, and the defendant's girlfriend, Ashley Brown, all lived in the same boarding house on Keystone Avenue in Memphis, Tennessee. A few days prior to the victim's murder, Ms. Brown claimed that the victim made romantic advances toward her. According to Ms. Brown, the victim never touched her, but he did

flirt with her.  When Ms. Brown spurned the victim's advances, he allegedly threatened to hurt her and the defendant.  Ms. Brown told the defendant of the incident and that she no longer felt safe living at the boarding house.  However, the defendant did not appear to believe her, so Ms. Brown moved out.

As part of the investigation into the victim's murder, law enforcement was able to retrieve video of the murder from an across-the-street neighbor's security system.  The security system had numerous surveillance cameras, several of which were pointed at the street and the boarding house.  According to the video, on October 4, 2017, at 1:24 a.m., the defendant, who was driving a red Nissan Versa hatchback, pulled into the driveway at the boarding house.  A few minutes later, the victim, who drove a white Nissan Versa, also pulled into the driveway and boxed the defendant's car in.  At 2:19 a.m., the defendant left the boarding house but had to maneuver his car through the front yard in order to get around the victim's car and out of the driveway.

At 2:40 a.m., the defendant can be seen walking down Keystone Avenue, crossing the street to the boarding house, crouching behind the victim's car, and then shooting the victim, who was sitting in his car, several times.  According to the medical examiner's report, the victim was shot two times in the head and two times in the neck.  The bullets penetrated the victim's brain, chest, spine, and lungs.  The victim died as a result of his wounds.  The defendant immediately fled the scene and returned to his car.  Then, at 2:47 a.m. and 2:59 a.m., the defendant can be seen driving back and forth down the street, checking to see if anyone had found the victim's body.

The defendant eventually left the scene and picked up Ms. Brown.  Once with Ms. Brown, the defendant confessed to her that he had killed the victim.  The defendant then drove Ms. Brown down a back road, where he tried to discard his clothes and one of the guns he owned.  The defendant and Ms. Brown then drove back to the crime scene.  Upon arriving back at the boarding house, the defendant told Ms. Brown to "act like [she] didn't know what happened" and "to knock on the window to get everybody['s] attention and . . . while [she] was distracting them to get their attention, [the defendant] was go[ing] [to] pick up the bullet shells."  While Ms. Brown created a distraction, the defendant can be seen walking to the driver's side of the victim's car, opening the door, and picking up shell casings from the ground.  At 4:40 a.m., two witnesses, Pierre McKinney and Tasha Maxwell, found the victim in his car.  At 4:44 a.m., the defendant and Ms. Brown left the scene after Mr. McKinney announced he was calling 911.  At 4:50 a.m., law enforcement arrived at the boarding house.

When law enforcement arrived at the crime scene, they discovered the victim's body and spoke with Mr. McKinney and Ms. Maxwell.  They also observed the deceased victim in the driver's seat of his car with four bullet wounds to the back of his head and neck.  A

search of the victim's car produced a cell phone belonging to the victim and one nine-millimeter shell casing on the ground next to the car. However, no weapon was found on the victim's person or in his vehicle.

Based on the information obtained at the crime scene, including witness interviews and the security video, Sergeant Coburn, the lead investigator, developed the defendant as a suspect. Sergeant Coburn learned that both the defendant and Ms. Brown lived in the boarding house and were connected to a red Nissan Versa hatchback. Sergeant Coburn searched for the defendant and Ms. Brown for over two weeks. Eventually, Sergeant Coburn found the defendant and Ms. Brown asleep in the red Nissan Versa hatchback at the defendant's grandfather's house and took both of them into custody. Sergeant Coburn arrested the defendant and Ms. Brown. Prior to his arrest, the defendant sold his second gun to a third party.

Upon questioning by law enforcement, the defendant gave a statement in which he ultimately admitted to shooting the victim. The defendant also admitted to returning to the crime scene with Ms. Brown, where they saw seven or eight men across the street from the crime scene. After driving down the street, the defendant and Ms. Brown parked their car behind the victim's car and exited their car to see if the victim was "still there." Ms. Brown then knocked on windows to wake up the other boarding house residents, and "everyone came out looking inside the [victim's] car wondering how that happened." A man named "Pierre" "said he was going to call law enforcement." The defendant then claimed he needed to leave because he had an outstanding warrant.

Finally, the State also introduced evidence that during a post-arrest jail call, the defendant told Ms. Brown, "I did it for you," and "don't let everything I did go to waste."

At the conclusion of the proof, the jury found the defendant guilty of first-degree premeditated murder and tampering with evidence. As a result of his convictions, the trial court sentenced the defendant to an effective sentence of life plus three years in prison. This timely appeal followed.

### *Analysis*

On appeal, the defendant contends the trial court erred in denying his motion to suppress. He also contends the evidence presented at trial was insufficient to support his convictions. The State contends that the trial court properly denied the defendant's motion to suppress and that the evidence is sufficient. Upon our review of the record and the applicable law, we agree with the State and affirm the judgments of the trial court.

I.        Motion to Suppress

The defendant argues the trial court erred in failing to grant his motion to suppress. Specifically, the defendant contends that law enforcement failed to advise him of his rights at the "outset." Additionally, the defendant contends the interrogation was coercive based on a violation of his *Miranda* rights, the tactics used by law enforcement, and the defendant's inability to understand those rights. However, based on our review, the proof presented during the hearing does not preponderate against the determination of the trial court. Accordingly, the defendant is not entitled to relief.

Suppression issues on appeal are subject to a well-established standard of review. Appellate courts are bound by a trial court's findings of facts determined after a suppression hearing unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Matthew T. McGee*, No. E2011-01756-CCA-R3-CD, 2012 WL 4017776, at *2 (Tenn. Crim. App. Sept. 13, 2012). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. Appellate courts should consider the entire record, affording the prevailing party "the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence." *McGee*, 2012 WL 4017776, at *2 (citing *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001)); *see also State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014). However, applying the law to the factual findings of the trial court is a question of law, which is reviewed *de novo* on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fifth Amendment to the United States Constitution, applicable to states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. If a suspect is in police custody "or otherwise [has been] deprived of his freedom of action in any significant way," law enforcement must first inform him of his Fifth Amendment rights for any subsequent confession to later be admissible as substantive evidence. *Miranda*, 384 U.S. at 444. In this regard, the United States Supreme Court has said, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* These rights may be voluntarily, knowingly, and intelligently waived. *Id.*

The *Miranda* decision only applies "to the questioning of an individual who has been taken into custody or otherwise deprived of his freedom by the authorities in a significant way." *State v. Dailey*, 273 S.W. 3d 94, 102 (Tenn. 2009) (quoting *Miranda*,

384 U.S. at 478) (internal quotation marks omitted). Accordingly, *Miranda* warnings are only required when a suspect is (1) in custody and (2) subjected to questioning or its functional equivalent. *State v. Walton*, 41 S.W. 3d 75, 83 (Tenn. 2001). In the absence of either, *Miranda* requirements are not necessitated. *Id.*

The test for determining if an individual is in custody for *Miranda* purposes is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996). This is a fact-specific inquiry, and our Supreme Court has provided the following non-exhaustive list of relevant factors:

> [T]he time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt, and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.* The defendant bears the initial burden of proving custody for the purposes of *Miranda* before the burden shifts to the State to prove the voluntariness of the statement. *State v. Moran*, 621 S.W.3d 249, 258 (Tenn. Crim. App. 2020).

While it is clear that the defendant was taken into custody at 11:30 a.m. when he was transported to the police station and placed in an interview room, he was not questioned by law enforcement until after he was advised of and waived his *Miranda* rights at 4:40 p.m. Accordingly, contrary to the defendant's claim, there was no *Miranda* violation as the defendant was not questioned until after he was advised of and waived his rights.

At the suppression hearing and on appeal, the defendant suggests that he was interrogated by law enforcement upon arriving at the police station, and therefore, he should have immediately been advised of his right at that point. However, our review of the record does not support the defendant's claim. Sergeant Coburn testified that though the defendant arrived at the station at 11:30 a.m. and was placed in an interrogation room, he was not questioned until after he was advised of and waived his *Miranda* rights. More specifically, after Sergeant Coburn testified that they presented the defendant with an

advice of rights form, had the defendant read the form out loud, and the defendant signed the form at 4:40 p.m. prior to the defendant giving a statement, the State asked Sergeant Coburn directly, "And is this before y'all began talking to him, or after y'all began talking to him?" In response, Sergeant Coburn unequivocally stated, "Before." Therefore, contrary to the defendant's claim, the record makes clear that the defendant was not questioned by law enforcement until after he was advised of and waived his *Miranda* rights. Therefore, the defendant's *Miranda* rights were not violated, and he is not entitled to relief.

In addition to claiming his *Miranda* rights were violated, the defendant also claims his statement was the result of coercion and, therefore, not voluntary. Again, the defendant suggests he was interrogated from the time he entered the police station at 11:30 a.m. until he signed his formal written statement at 9:12 p.m. However, as discussed *supra*, the record does not support the defendant's claim. Rather, the defendant was not questioned until after he was advised of and waived his rights for the first time at 4:40 p.m. We would also note that the defendant was again advised of and waived his rights a second time prior to giving his formal written statement. Accordingly, as we have previously concluded, the defendant's *Miranda* rights were not violated.

Apart from our inquiry into the defendant's waiver of his *Miranda* rights, we must also determine whether his subsequent statement or confession was voluntarily given. *See Dickerson v. United States*, 530 U.S. 428, 432-33 (2000) (indicating that the test to determine the voluntariness of a statement is distinct from the determination concerning a defendant's waiver of his *Miranda* rights). In determining the voluntariness of a confession, the essential inquiry is whether a suspect's will was overborne so as to render the confession a product of coercion. *Id.*; *see also State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) ("The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment.").

In order to determine the voluntariness of the defendant's statement, we must consider the totality of the circumstances surrounding the statement, including "both the characteristics of the accused and the details of the interrogation." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (quoting *Dickerson*, 530 U.S. at 434). The circumstances relevant to this determination are:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused

was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id.* (alterations in original) (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996)).

Our review of the record affirms the trial court's finding that the defendant's statement was voluntary and uncoerced. Sergeant Coburn testified that the defendant was not under the influence of any intoxicants, appeared calm, and was not overly emotional. According to Sergeant Coburn, the defendant told him that he did not suffer from any type of mental disorder, graduated from twelfth grade, and understood he was speaking to law enforcement. Moreover, officers gave the defendant multiple advice of rights forms which the defendant read out loud and signed each time, and at no time did the defendant indicate he wished to exercise his rights and terminate the interrogation or speak with a lawyer. Officers also provided the defendant with food, water, and bathroom and smoke breaks while he was in custody. Finally, as previously noted, the trial court explicitly accredited Sergeant Coburn's testimony of the events of the interrogation, including discrediting the defendant's claim that officers "banged on the table" and threatened to arrest his girlfriend unless he confessed, and the trial court concluded that the "defendant understood what was going on and was not compromised by any mental issues."

This proof, taken together, confirms that the defendant's statement was not "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence" or law enforcement overreach. *Bram v. United States*, 168 U.S. 542, 542-43 (1987). Accordingly, under the totality of the circumstances, it is clear the defendant's statement to law enforcement was voluntary and was not a product of coercion. *See Climer*, 400 S.W.3d at 568. The defendant is, therefore, not entitled to relief.

II.     Sufficiency of the Evidence

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions

involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

### A. First-Degree Murder

As relevant here, first-degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2012). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2012). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (2012). Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id*. Premeditation "may be established by proof of the circumstances surrounding the killing." *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Moreover, there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *Id*. Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the

killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003) (citing *Suttles*, 30 S.W.3d at 261; *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998)).

Viewed in the light most favorable to the State, the evidence presented at trial reveals that the defendant confessed to the murder on three separate occasions. First, the defendant confessed to his girlfriend, Ms. Brown, minutes after the murder. Then, though he claimed the victim pulled a gun on him first, the defendant confessed to Sergeant Coburn. Finally, on a recorded phone call from jail, the defendant told Ms. Brown, "I did it for you."

In addition to the defendant's confessions, the video from the neighbor's security system shows the defendant leave the boarding house in a red Nissan Versa. Then, according to the defendant's own statement, he returned to the boarding house and saw the victim sitting in his car in the driveway. Rather than confront the victim directly, the defendant parked his car down the street and walked back to the boarding house. Per the video, the defendant snuck up on the victim's car, crouched behind the car so as not to be seen by the victim, and then fired several shots into the victim's car, hitting the victim four times in the back of the head and neck area. Then, after shooting the victim, the defendant failed to render aid and calmly left the scene. Later, the defendant and Ms. Brown returned to the scene, and the defendant attempted to retrieve the shell casings from the scene. Additionally, the defendant further attempted to cover up his crime by disposing of his clothing and both of the guns he owned. Finally, the proof revealed that the victim was not armed at the time of the murder.

Based on the recited evidence, a reasonable jury could conclude that the defendant intentionally and with premeditation shot and killed the victim. The defendant procured a weapon; he used that deadly weapon on an unarmed victim; he stalked his victim; and he then shot his victim numerous times in the back. After shooting the victim, the defendant failed to render aid and calmly walked away from the scene. Finally, the defendant returned to the scene to remove his spent shell casings and disposed of his clothing and any guns connected to him, including the murder weapon, in an attempt to cover up his involvement in the victim's murder. Accordingly, the evidence is sufficient to sustain the jury's finding of premeditation and verdict of first-degree murder.

The defendant focuses his argument on his claim that the victim threatened Ms. Brown and that the victim pulled a gun on the defendant. However, the jury heard this testimony, including the fact that no gun was found on the victim or in the victim's car, and by its verdict of guilty, rejected the defendant's claim. As noted *supra*, "[a]ll questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *Pappas*, 754 S.W.2d at 623. Accordingly, the evidence supports the jury's verdict, and the defendant is not entitled to relief.

*B. Tampering with Evidence*

Next, the defendant contends the evidence is not sufficient to support his conviction for tampering with evidence. More specifically, the defendant argues that the State failed to establish that he retrieved the spent shell casings from the crime scene after the defendant "formed a belief that an investigation was pending or in progress." The State submits the evidence is sufficient to support the conviction. Upon our review of the record and the applicable law, we agree with the State and affirm the jury's verdict.

Relevant here, Tennessee Code Annotated section 39-16-503(a)(1) sets forth the following definition of tampering with evidence:

> (a) It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress to:
> (1) Alter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding[.]

Tenn. Code Ann. § 39-16-503(a)(1).

The statute requires the State to prove "timing, action, and intent" beyond a reasonable doubt. *State v. Hawkins*, 406 S.W.3d 121, 132 (Tenn. 2013) (quoting *State v. Gonzales*, 2 P.3d 954, 957 (Utah Ct. App. 2000)). "The 'timing' element requires that the act be done only after the defendant forms a belief that an investigation or proceeding 'is pending or in progress.'" *Id*. (emphasis added); *see also State v. Smith*, 436 S.W.3d 751, 763 (Tenn. 2014). "The 'action' element requires alteration, destruction, or concealment." *Hawkins*, 406 S.W.3d at 132. To "conceal" a thing means "to prevent disclosure or recognition of" a thing or "to place [a thing] out of sight." *Id*. (citing *State v. Majors*, 318 S.W.3d 850, 859 (Tenn. 2010)). For "intent" to be established, the proof must show that through his actions, the defendant intended "to hinder the investigation or official proceeding by impairing the record's, document's or thing's 'verity, legibility, or availability as evidence.'" *Id*. (quoting Tenn. Code Ann. § 39-16-503(a)(1)). Tampering with evidence is a "specific intent" crime. *Id*. (internal citations omitted).

The defendant focuses his argument on the "timing" element of tampering with evidence, claiming that he did not know an investigation was pending or in progress. Though the evidence supporting the defendant's conviction on this charge is not lengthy, it is sufficient to sustain the jury's verdict.

Here, the State alleged that the defendant tampered with evidence by removing the shell casings while knowing an investigation was pending or in progress. Initially, we note that the defendant drove by the boarding house several times after the murder in order to see if anyone had discovered the body. Once the defendant determined the victim had not been discovered, he returned to the scene, had Ms. Brown create a diversion, and retrieved his spent shell casings from around the victim's vehicle. Reasonable minds can conclude that the defendant was checking the scene because he knew that the moment the body was discovered an investigation would commence and he needed to retrieve any evidence, i.e. the shell casings, before it did. Additionally, reasonable minds can also conclude that the defendant removed the shell casings from the scene in order to hide his identity as the shooter. Finally, after retrieving his shell casings, the defendant was informed by Mr. McKinney that he had called the police. At that moment, the defendant knew for certain that an investigation was pending. And, it was also at that moment that the defendant left the scene with the shell casings.

Based on the foregoing, it is clear the defendant knew an investigation into the victim's death was pending at the time he removed evidence of his crime—the shell casings—from the scene. Therefore, the evidence was sufficient for a rational trier of fact to find the defendant guilty of tampering with evidence, and we affirm the defendant's conviction.

### Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
J. ROSS DYER, JUDGE

- 14 -